**In Re Anonymous No. 73 D.B. 83, No. 4 D.B. 84 & No. 41 D.B. 84**

Disciplinary Board Docket Nos. 73 D.B. 83, 4 D.B. 84 & 41 D.B. 84.

To the Honorable Chief Justice and Justices of The Supreme Court of Pennsylvania:

DOUGLAS, *Member*, January 10, 1986—Pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d), the Disciplinary Board of the Supreme Court of Pennsylvania (board) submits its findings and recommendations to your honorable court with

respect to the above-captioned petitions for discipline.

## I. SUMMARY OF CASE

The first charge against respondent, Esq., came from the fact that she was Secretary-Treasurer, General Counsel and an investor in [A] Corporation. This was a building construction firm, which was in default on a $120,000 first mortgage to the [B] Savings and Loan Association and a second mortgage to [C] Bank in the amount of $60,500 on their building, in which respondent, also had her law office. [B] informed [A] that if they did not receive $16,315.49 by September 29, 1978, they would foreclose. Respondent, who had done the estate planning for [D], knew that her client had a certificate of deposit in approximately the same amount, which was due for renewal. In September of 1978, without explaining her association with [A] and the serious financial condition of this corporation, she talked her client into loaning $16,940.49 to [A], stating that the loan would be secure, and that she would get a better return on her money. Respondent deposited the $16,940.49 in her escrow account and commingled it with her own. Although there was a $17,000 mortgage to her client for five years at 9⅝ percent interest, it was never recorded. Respondent withdrew money from the escrow account for her own use. She kept no record of any of this money going to [A]. The next month, the client demanded the return of her money, but respondent refused, stating that the transaction had been completed. [A] filed for reorganization under Chapter 11 of the Bankruptcy Code on January 9, 1981. [D]'s money was never returned to her.

The second charge involved $3,850 that respondent received from [E] Insurance Company on No-

vember 9, 1977, for her client [F]. Respondent deposited the money in her escrow account. Although she had her client sign a release, as late as January 13, 1978, she wrote to her client stating that [E] had not as yet paid the money, but had promised to do so by January 25, 1978. Once again respondent used money out of this escrow account for her own benefit and the balance went below the $3,850. On March 2, 1978, respondent paid her client $370,00 and, finally, on April 10, 1978, paid her $2,082.31.

In the third charge, respondent received $55,637 in November of 1977 from the [G] Redevelopment Authority. Although the check was made payable to "[H] and [I], individually, and trading as [H] and [I] Optical Company, a partnership, and [Respondent], Attorney," respondent endorsed the check, and deposited it in her escrow account. Once again, her escrow account fell below the aforesaid amount. It was not until January 9, 1978, that respondent made a distribution to her clients, less her fee.

In the fourth charge, in a marital property settlement, respondent received $504.92 from "HUD," on August 11, 1980, payable to "[J] and [K] c/o [respondent], Atty. at law." She endorsed the check, and deposited it in her escrow, account. She did not inform her client or the attorney on the other side. She never turned the money over to either her client or the attorney on the other side.

In the fifth count, as executrix of her mother's will and trustee for her nieces and nephew, she lent $40,000 to [A], of which she was counsel. After efforts to get her to file an accounting failed, and after respondent failed to appear without excuse, Judge [L] ordered that respondent be arrested and be committed to the county prison. When the court reconvened on respondent's contempt citation, respondent admitted that she did not have the $40,000

trust-fund money, because it had been lent to [A]. The nephew has never received most of this trust fund and two nieces received none of theirs.

In the sixth count, the sole asset in the estate of [M] was $10,702.81 in proceeds of a life insurance policy, which was received on February 29, 1979. Respondent opened an estate account, and had the administrator pay her a $1,000 fee. She then forged the administrator's signature, and drew another $3,907.82 out of this estate account, and put it in her escrow account. Even though the account and · schedule of distribution was approved by Judge [N] on April 6, 1981, respondent continued to stall on paying $3,964.81 to [O], the beneficiary. [O] finally engaged [P], Esq., to assist her. On January 27, 1982, respondent wrote to Judge [N] stating that there were no more estate checks in the checkbook, so she was using her own escrow account check in the amount of $3,964.81. She enclosed the check for the judge to forward to [P], Esq. There were not sufficient funds in the escrow-account to cover this check. Finally, respondent used $3,910.82 from the funds of another client, [Q], to pay the aforesaid $3,964.81 to [O] on March 10, 1982.

In the seventh count, she was issued a subpoena duces tecum to appear before investigatory hearing committee [ ]. On November 5, 1981, respondent testified that she had only one bank account, which was an escrow account in the [C] Bank. She knew this was untrue, for she also had funds from her legal practice in an account in the [R] Bank and Trust Company, in names "respondent, Attorney-at-law, and [S]." (He was president of [A], Inc.)

In the eighth count, a judgment creditor of [A], Inc., issued an attachment execution against two of [A]'s tenants in [A]'s building located at [ ], namely [T], a real estate broker, and Dr. [U], a dentist. Re-

spondent told Dr. [U] that it was all right for him to continue paying rent to [A]. When [T] began putting her rent payments in escrow, respondent filed a complaint for ejectment and money judgment against [T]. In this complaint, respondent, failed to state that [T]'s rent had been garnished. Respondent confessed judgment, issued execution and attached [T]'s bank account. [T] filed an abuse-of-process suit against [A] and respondent. When Dr. [U] was served with a subpoena to appear for a deposition, respondent told him to ignore it. When Dr. [U] was served with a rule to show cause why he should not be held in contempt, she again told him that she would handle all legal proceedings. When judgment was entered against Dr. [U], he was again told the same thing by respondent. Finally Dr. [U] had to pay the judgment.

On June 7, 1984, as a result of a petition for emergency interim suspension, in which Mary Bell Hammerman of the Disciplinary Board concurred, the Supreme Court issued an order in which respondent was "suspended from the practice of law forthwith and until further definitive action by this court." Respondent's petition for reconsideration was denied on July 13, 1984.

Hearing committee [ ] held investigatory hearings on subpoena. [ ], Esq., Chairman of hearing committee [ ], set forth respondent's tactics of delay and denial of access to her records from October 22, 1981, to August 20, 1982. (Report of hearing committee [ ], May 9, 1983.)

Hearing committee [ ] heard testimony of 23 witnesses, covering 1,049 pages of transcript, on April 18, May 17, June 5, 6, and July 11, 1984. Respondent represented herself. Respondent was given opportunities to present further evidence on Sep-

tember 25, 1984 and May 15, 1985. The record was then closed.

As a result of the aforesaid conduct on the part of respondent, disciplinary proceedings were initiated, charging respondent with the following violations:

A. D.R. 1-102(A) (3), which prohibits an attorney from engaging in illegal conduct involving moral turpitude;

B. D.R. 1-102(A) (4), which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

C. D.R. 1-102(A) (5), which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

D. D.R. 1-102(A) (6), which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law:

E. D.R. 2-110 (B) (1), which requires that a lawyer representing a client before a tribunal shall withdraw from employment if she knows or it is obvious that her client is bringing the legal action, conducting the defense, asserting a position in the litigation or otherwise having steps taken for him merely for the purpose of harassing or maliciously injuring any person;

F. D.R. 2-110(B) (2), which requires an attorney representing a client before a tribunal to withdraw from employment if she knows or it is obvious that her continued employment will result in the violation of a Disciplinary Rule;

G. D.R. 4-101(B) (1), which prohibits an attorney from knowingly revealing a confidence or secret of a client;

H. D.R. 4-101(B) (3), which prohibits an attorney from knowingly using a confidence or secret of a client for the advantage of the attorney or a third per-

son without the client's consent after full disclosure;

I. D.R. 5-101(A), which prohibits an attorney from accepting employment if the exercise of her professional judgment on behalf of her client will be, or reasonably may be, affected by her financial, business, property or personal interests, except with the consent of her client after full disclosure;

J. D.R. 5-101(B), which prohibits a lawyer from accepting employment in contemplated or pending litigation if she knows or it is obvious that she or a lawyer in her firm ought to be called as a witness;

K. D.R. 5-102(A), which requires a lawyer to withdraw from representation if, after undertaking employment, the lawyer learns or it is obvious that she ought to be called as a witness on behalf of the client;

L. D.R. 5-104(A), which prohibits an attorney from entering into a business transaction with a client if they have differing interests therein and if the client expects the attorney to exercise professional judgment for the protection of the client, unless the client has consented after full disclosure;

M. D.R. 5-105(A), which requires a lawyer to decline proffered employment if the exercise of her independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involved her in representing differing interests;

N. D.R. 5-105(B), which prohibits a lawyer from continuing multiple employment if the exercise of her independent professional judgment in behalf of a client will be or is likely to be adversely affected by her representation of another client, or if it would be likely to involve her in representing differing interests;

O. D.R. 6-101(A) (3), which prohibits an attorney from neglecting a legal matter entrusted to her;

. P. D.R. 7-101(A) (1), which prohibits an attorney from intentionally failing to seek the lawful objectives of a client through reasonably available means permitted by law and Disciplinary Rules;

Q. D.R. 7-101(A) (3), which prohibits an attorney from intentionally prejudicing or damaging a client during the course of the professional relationship; .

R. D.R. 7-102(A) (2), which prohibits an attorney in her representing of a client, from knowingly advancing a claim or defense that is unwarranted under existing law;

S. D.R. 7-102(A) (3), which prohibits an attorney from concealing or knowingly failing to disclose that which she is required by law to reveal;

T. D.R. 7-102(A) (5), which prohibits an attorney during her representation of a client, from knowingly making a false statement of law or fact.

U. D.R. 7-104(A) (1), which prohibits an attorney from communicating or causing another to communicate on the subject of the representation to a party she knows to be represented by a lawyer in that matter without the prior consent of the lawyer representing such other party or authorization by law;

V. D.R. 7-104(A) (2), which prohibits an attorney from giving advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interest of her client;

W. D.R. 9-102(A), which requires that all funds of clients paid to an attorney, except for advances for costs and expenses, be kept in identifiable bank accounts in the state in which the attorney's office is located and that no funds belonging to the attorney shall be deposited therein except for funds suf-

ficient to pay bank charges and funds belonging in part to the client and in part to the attorney;

X. D.R. 9-102(B) (1), which requires an attorney to promptly notify a client of the receipt of the client's funds, securities or other properties;

Y. D.R. 9-102(B) (3), which requires an attorney to maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and to render appropriate accounts to the client regarding them; and

Z. D.R. 9-102(B) (4), which requires an attorney to promptly pay or deliver to a client as requested by the client funds, securities or other properties in the lawyer's possession which the client is entitled to receive.

We adopt and incorporate by reference to findings of fact and conclusions of law set forth in the report and recommendation of hearing committee [    ] (pp. 19-96 and 123-133, respectively).

## II. DISCUSSION

The earliest of the aforesaid offenses of respondent involved her own mother's estate, of which respondent was made executrix on January 24, 1974. By August 16, 1976, Judge [L] called her in an attempt to get this estate moving towards a conclusion. There were many broken promises, until finally Judge [L] put her in jail on March 3, 1983. Respondent then finally admitted to Judge [L] that she had lost $40,000 out of the estate by a loan to [A], Inc.

In November of 1977, respondent received $55,647 from the [G] Redevelopment Authority. Although the check was made payable to her clients and herself, she deposited the money in her escrow account, and made use of the money for personal

reasons until January 9, 1978, when she turned the money over to her clients, less her fee.

On November 9, 1977, respondent received $3,850 from the [E] Insurance Company. She lied to her client, stating that the money had not yet been paid, and made use of the money personally, until April 10, 1978.

In September of 1978, she talked one of her clients, [D], into lending $16,940.49 to [A], Inc., in order to prevent a foreclosure against [A], without telling the client of the precarious financial condition of [A], or her own involvement with [A]. The client lost the money.

On August 11, 1980, respondent received $504.92 from H.U.D., but never turned it over to her client.

On November 5, 1981, respondent lied to a Disciplinary Board Hearing Committee about the bank account that she had.

On January 27, 1982, respondent gave Judge [N], of the [   ] Orphans' Court, a check for $3,964.81 to turn over to another attorney in the [M] Estate. The check "bounced."

On June 7, 1984, as a result of a petition for emergency interim suspension, your honorable court suspended respondent from the practice of law.

## III. RECOMMENDATION

For the foregoing reasons, by a unanimous vote of those board members, who voted, the board recommends that respondent be disbarred and that costs are to be paid by respondent. John Padova abstained from voting as he knew one of the families who were the unfortunate clients of respondent. Winfield Keck, Judith Heh and John A. Tumolo, Esq., were absent.

## ORDER

NIX, *C.J.,* And now, this March 25, 1986, upon consideration of the report and recommendations of the Disciplinary Board dated January 10, 1986, it is hereby ordered that respondent be and she is disbarred from the Bar of this Commonwealth, and she shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.